**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

Jane Doe,

        Plaintiff,

    v.

Citigroup Inc., Citigroup Global Markets, Inc.

        Defendants.

Case No.  1:26-cv-3579

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Jane Doe,[1] by and through her attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendant Citigroup, Inc. and Citigroup Global Markets, Inc. (together, "Citi" or "Defendants"), and states as follows:

## JURISDICTION AND VENUE

1.      The claims of Plaintiff arise under the Sarbanes-Oxley Act of 2002, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331.[2]

2.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b). Defendants employed Plaintiff Long Island City in Queens County within this District. The unlawful conduct alleged in this Complaint occurred in this District and harmed Plaintiff in this District.

## PARTIES

3.      Defendant Citigroup Inc. is a publicly traded, global financial services firm and

---

[1] Plaintiff pleads this complaint under the pseudonym "Jane Doe" and is filing a motion to proceed anonymously concurrently herewith.
[2] Plaintiff's other claims against Defendants, including for race and sex discrimination and breach of contract, are being submitted for arbitration.

Fortune 50 company incorporated in Delaware with its principal place of business in New York. In 2024, Citigroup reported revenues of $81.1 billion and a net income of $12.7 billion. Citigroup Inc. is registered under Section 12 of the Securities Exchange Act of 1934, and Citigroup Inc. is required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

4. As part of its wealth management services, Citigroup offers securities brokerage and dealing services through its wholly owned subsidiary Citigroup Global Markets Inc., a New York corporation with its principal place of business in New York. Citigroup Global Markets Inc. In 2024, Citi's wealth management business, through divisions like the Private Bank, Wealth at Work, and Citigold, managed approximately $587 billion in client assets, and earned over $7 billion in revenues and over $1 billion in net income.[3]

5. Citigroup Global Markets Inc. financial information is included in the consolidated financial statements of Citigroup Inc. that are filed with the Securities and Exchange Commission and are intended to be and are relied upon by shareholders pursuant to federal securities laws.

6. Citigroup Inc. includes in its SEC filings information about its and its subsidiaries' compliance and risk management. In its 2024 Form 10-K, for instance, Citigroup Inc. included a section entitled "Improved Risk Management," the first entry of which was that Citigroup Inc. "Closed the 2013 Consent Order with the FRB related to anti-money laundering and Bank Secrecy Act deficiencies."[4]

7. Plaintiff Jane Doe is an East Asian American woman who resides in and is a

---

[3] *https://www.citigroup.com/rcs/citigpa/storage/public/10K20250221.pdf*
[4] https://www.citigroup.com/rcs/citigpa/storage/public/10K20250221.pdf

citizen of New York. Citi employed Doe as ████████████████████████ ████████████ primarily in Queens County, New York until it unlawfully terminated her employment in 2025.

## ADMINISTRATIVE PROCEDURES

8.    Doe filed a Complaint with the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA").

9.    More than 180 days have passed since Doe filed her Complaint with OSHA and no final decision has been issued with respect to the allegations in her Complaint.

10.    Accordingly, Doe is entitled to seek *de novo* review of her allegations in federal court. 18 U.S.C. § 1514A(b)(1)(B).

11.    Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL BACKGROUND

*Citi Hires Doe, a Risk-Management Professional with an Established Career at a Major Bank, to Clean Up Its Bottom-of-the-Industry Risk Management Practices*

12.    Plaintiff Jane Doe built a long and successful career in the financial services industry. Doe worked for over more than a decade in the financial services industry, where she spent approximately a decade focusing on risk management within a major bank's wealth management business. Doe enjoys a strong professional reputation as an expert in risk management and compliance and earned professional degrees from major educational institutions.

13.    In 2024, after Doe had risen to a Managing Director level in risk management, a Citi recruiter hotly pursued Doe to the senior executive role in risk management.

14.    Doe was hesitant. She had achieved a comfortable and lucrative career at another major bank and had developed an excellent professional reputation after more than a decade with

3

the firm. Citi, on the other hand, had a reputation within the financial services industry for lax risk management and had just completed large-scale layoffs and reorganization. Additionally, departing the other major bank would mean forfeiting a significant amount of equity and debt awards.

15.     To induce Doe to abandon her stable career, and to assuage her concerns about potential last-in, first-out layoffs at Citi, after negotiations Citi promised Doe that she would receive a substantial base salary of and a guaranteed award slightly less than one year's base salary, plus replacement cash and equity awards in lieu of her roughly equivalent forfeited compensation from her prior employer.

16.     Doe's hiring manager Ajit Sequeira, a South Asian man, even called Doe to reassure her after the US regulators fined Citigroup a combined $135.6 million for failing to sufficiently remediate data quality, risk management, and internal control deficiencies stemming from a 2020 consent order.

17.     In June 2024, Citi sent Doe an offer letter (the "Offer Letter") for the position of a level C16 Managing Director.

18.     In the Offer Letter, Citi promised to pay Doe in replacement for the equity and debt awards she would be forced to give up by coming to Citi, in two components.

19.     First, Citi promised to pay Doe "Replacement Cash In Lieu of Forfeited Equity Award," according to a detailed formula based on her prior employer's stock prices, to vest 100% on March 20, 2025.

20.     Second, Citi promised to pay Doe a "Replacement Equity Award," in the form of a deferred stock award under the Citi Stock Award Program, to vest in two installments in 2026 and 2027.

21.     The Offer Letter also contained a section entitled "guaranteed award." Three quarters of the Guaranteed Award in the offer letter would be paid no later than March 15, 2025, with the remaining portion to be deferred and delivered in installments as part of year-end bonuses beginning after the end of 2025.

22.     The Offer Letter provided that the Guaranteed Award could be delayed or reduced if Doe received "disciplinary action of any kind," according to a schedule in a separate document called the Accountability Framework Procedure.

23.     But the Guaranteed Award would not be fully repayable unless Doe resigned or was terminated for Cause, which was expressly defined in the Offer Letter as a list of 13 reasons inapplicable here.

### As Promised, Doe Identifies Several Risk-Management Deficiencies, but Citi Retaliates Against Her

24.     Doe accepted the offer letter and began working at Citi in October 2024, where she led a group of roughly 100 employees working in risk management across a variety of Citi's wealth management groups.

25.     Doe reported to Ajit Sequeira, Citi's Head of Wealth Enterprise Risk Management and Controls.

26.     Employees within Doe's scope were relieved to have an experienced and knowledgeable risk-management professional in charge of risk management and were vocal with her from day one about problems within the office culture, and Sequeira's incompetent stewardship of risk management.

27.     These employees also complained to Doe of low morale because Citi had demoted several employees—in particular, women of color—throughout the business in connection with its reorganization. Doe learned that in the most recent reorganization, at least

four women in her own teams were demoted to lower pay rank in the organization chart, lowering their status and decreasing their earning and promotional potential.

28.    Simultaneously, Doe heard frequently from Sequeira and HR Stephanie Butterworth that the team she inherited was underperforming and that Doe needed to clean house.

29.    After approximately one month on the job, Citi unexpectedly foisted on Doe the responsibility of managing the Anti Money Laundering ("AML") Governance and Oversight group, placing dozens of additional employees under her remit. Citi further pushed several other responsibilities onto Doe, including Reputation Risk Governance, Fraud Prevention and Conduct Risk Management, without any addition to her headcount. Importantly these additional responsibilities have been neglected for at least a year in Citi Wealth, in clear contravention to firm policies and procedures.

30.    Despite Citi's insistence on constantly dumping new responsibilities on Doe, Doe excelled in her role, not only handling her responsibilities with aplomb, but also proactively identifying and attempting to remediate Citi's many risk-management deficiencies.

31.    Unfortunately, because of Citi's culture of hostility toward risk-management controls, Citi answered Doe's many successes with escalating retaliation.

32.    For example, around the time Doe started, ███████████████████ █████████████████████████████████████████████████. Most employees at Citi were wary of taking responsibility for fixing the deficiencies. Indeed, Doe's team warned her that if she took ownership of resolving these deficiencies, it would likely decrease her compensation, and Doe's supervisor Sequeira would be furious.

33.    Doe nonetheless agreed to take ownership of the findings, because this sort of

remediation is exactly what Citi hired her to do. Her decisive, team-player approach won her many supporters, including the lead auditor, Nicole Scherrer, and the head of Private Bank, Ida Liu.

34.    While investigating these findings and within the course of her duties, Doe identified even more deficiencies in Citi's ▮▮▮▮▮▮▮. As one example, Doe discovered that



35.    Citi had repeatedly represented in public securities filings that, for instance, "Citi continues to monitor the war in Ukraine, related sanctions and economic conditions and continues to mitigate its Russia exposures and risks as appropriate."[5]

36.    But Doe found and reported internally that as ▮▮▮▮▮▮▮▮▮▮▮



37.    In yet another example, Doe learned in late 2024 that Citigold client ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At the time, regulatory and compliance Know Your Customer ("KYC") protocols required financial institutions to ascertain there are no ▮▮▮



---

[5] Citigroup Inc. 2023 10-K,
https://www.citigroup.com/rcs/citigpa/storage/public/10k20231231.pdf

██████████████████████████████████████. It is an industry practice that financial institutions conduct negative news search for such concerns, and indeed it is Citi policy to have financial advisors confirm on an intake form that there is no negative news. The advisor who opened ███████ account falsely checked the box that there was no negative news.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████, Doe quickly escalated the matter to Andy Sieg, the head of Citi Wealth.

38. Yet again, rather than receiving accolades for her initiative, Doe was criticized by the head of Citigold, David Poole, for escalating the issue. █████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████ Similarly, Chief Compliance Officer Bob Cole insisted that the matter be swept under the rug, ████████████████████████████████████████████

████████████████████████████████

39. Similarly, Doe observed that Citi had even worse ████████████████

████████████████████████████████████████████████████

███████████████████████████████ For example, Doe was aware that ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. Doe shared the industry practice of setting risk appetites for various jurisdictions with asset requirements or exits. In fact, Sieg's former firm BoA-Merrill exited Chinese nexus clients and another major bank exited

───────────────────────

███████████████████████████████████████████████

████████████████

Venezuelan clients to balance risk and rewards. However, Citi Wealth with its lofty revenue and growth ambition found the balancing act unappealing.

40.     Doe sent the *Journal* article to individuals with supervisory authority over her and Citi employees with the authority to investigate, discover, and terminate misconduct, including Sieg, COO Valentin Valderrabano, CCO Cole, AML officer Valeria Vitola, and Sequeira. Doe promised them that she would ensure that any similar risks at Citi were identified and remediated.

41.     Rather than celebrate her initiative and service to Citi, Sequeira promptly chastised Doe for "upsetting" two men, Poole and Valderrabano, who had long been tasked with fixing a related problem ██████████████████████████████████████ ████████████ but had made no progress. Throughout Doe's tenure at Citi, Sequeira would frequently criticize Doe for stepping on men's toes by succeeding in tasks where the men had failed.

42.     As Doe identified problems with Citi's risk management controls, she sought to formalize her concerns by opening an "issue" within Citi's internal systems. Self-identified "issues" would require remediation and would come to the attention of Citi's assigned examiner at the Office of the Comptroller of the Currency ("OCC"), ████████████████████. Issues ranged in severity by Level, with Level 1 being the most serious concern.

43.     Under Citi's culture of lax controls and lack of accountability, ████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████.

44.     Doe, who was hired to turn around this anti-accountability culture, wanted to identify ████████████████████████████████████████ as a Level 2 Issue.

Doe identified a wide variety of improper controls, including:

-

  ████████████████████████████████████████

  ████████████████████████████████████████

- ████████████████████████████████████████████

  ██████████████

- ████████████████████████████████████████

  ████

45.     At the same time, Doe proposed sensible controls to address what she assessed to

be a Level 2 Issue. For example, Citi already performed more robust ███████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Doe proposed that Citi could adopt that

model in ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

_____

██████████████████████████████████████████████

████████████████████████████████████

██████████████████████

██████████████████████████████████████████

████████████████

Valderrabano and Sequeira neither acknowledged nor acted upon Doe's recommendation.

46.      But Doe's supervisors and other Citi risk-management stakeholders strongly discouraged Doe from formalizing her concerns about Citi's AML controls in a Level 2 Issue and successfully pressured her not to do so. They insisted that because Citi had , now was not the time to bring up new, high-Level Issues, lest she draw regulatory attention back to Citi.

***Citi Escalates Its Retaliation Against Her for Raising Serious Issues***

47.      In or around December 2024, mere months into Doe's job, Citi HR investigators contacted Doe, falsely claiming that by ██████████████████████████████ ████████████████████████████████, she was biased against certain nationalities.

48.      The "investigation" was a sham and a smokescreen designed to push out Doe because of her race, ethnicity, and gender, and in retaliation for her protected activity of internally reporting regulatory, operational, and reputational risks to Citi.

49.      Doe, a Chinese-heritage immigrant from Taiwan, harbored no such biases and had never been so much as accused of bias in her decades-long professional career. Doe never discriminated based on nationality. Rather, she focused correctly—and as Citi hired her to do— on tailoring ████████████████████████████████████████ ████████████.

50.      Doe spoke to Sequeira about the false charges against her, and Sequeira insisted

https://www.cnbc.com/2025/07/04/singapore-monetary-authority-penalizes-9-banks-institutions-for-2023-money-laundering-case.html

that it was commonplace, a "rite of passage", at Citi for managers to be subjected to HR investigations. He told her that he, for instance, had personally been the subject of many investigations that never affected him. Doe heard the same from COO Valderrabano.

51.    But because Doe was a disfavored East Asian woman, and a "troublemaker" who actually tried to manage Citi's risk rather than sweep it under the rug, the HR investigation into her was aggressive and confrontational.

52.    Undeterred, Doe continued to perform her job duties to her utmost ability and continued to press for more robust controls, especially concerning money laundering.

53.    Indeed, it is with Doe's findings and at her urging that the AML Officer Vitola ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████ Begrudgingly and faced with overwhelming evidence presented by Doe, the head of Citigold Poole and CCO Cole, among others, ████████████ ███████████████████████████████████████ ████████

54.    In or around March of 2025, Doe presented to Sieg and his leadership team about ███████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ Though Citi Wealth's Head of Internal Audit Maura

███████████████████████████████████████████████ ████████████

Kugler-Vasilescu praised Doe's presentation, Sequeira predictably criticized Doe for being outspoken and raising concerns.

55.     To dissuade Doe from gathering AML industry benchmarks, ██████████ ████████ and CCO Cole ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ the major bank where Doe worked before joining Citi. AML Officer Vitola ████████████████████████ and lobbied for Doe to join.

56.     Similarly, in or around March 2025, Doe escalated another serious ████████ to Chief Compliance Officer Bob Cole, ██████████████████ and Sequeira. Doe explained that ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ ██ Doe was aware that ██████████████████████████████ ██████████████████████████

57.     Doe also continued to identify regulatory and compliance risks that she believed to violate federal securities laws and misled shareholders. Doe reported to Sequeira that Citi's ████████████████████████████████████████ ████████████████████████████████████████



Doe continuously complained to Sequeira about the ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ .

58.    These ██ deficiencies ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██ When Doe presented to Sieg and his directs ██████████████████████████

████████████████████████████████████ Sequeira and Cole were livid for Doe's not consulting with them beforehand. Indeed, such is the Citi control culture, escalation is not encouraged and rounds of socialization is needed to ensure the "message" is right. Vested interests from lifers and saving face for those with authority and accountability are of the utmost importance than doing the right thing for shareholders and complying with laws, rules and regulations.

59.    Data deficiencies like these were substantial issues and indeed directly related to compliance with the Consent Order issued against Citibank by the Office of the Comptroller of Currency. Indeed, the 2020 Consent Order's first identified deficiency were "deficiencies in its data governance" and made specific findings that, in "with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting:

    a.    Failure to establish effective front-line units, independent risk management,

14

internal audit, and control functions as required by 12 C.F.R. Part 30, Appendix D;

b. Inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting; and

c. Inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies.

60. Compliance with the Consent Order was of material interest to Citi shareholders, such that Citi reported to the SEC and shareholders in, for instance, its 2024 Form 10-K that it had appointed a Chief Operating Officer (Anand Selva) to, among other things, "strengthen its risk and controls and data quality," and a Head of Technology and Business Enablement (Tim Ryan) to, among other things, "drive improvements to data quality and modernize infrastructure."[10]

61. So invested was Citi in avoiding running afoul of the Consent Order that Kathleen Martin, a high-level data governance executive hired in the wake of the Consent Order, alleged that Selva urged her to make false reports to the board and OCC about data governance multiple times to mask deficiencies in data governance. *See Am.* Compl., *Martin v. Citibank, N.A., et al.*, No. 1:24-cv-03949, Dkt. 1 (S.D.N.Y. May 22, 2024). Martin alleges that less than two weeks after she refused a second time to report false data governance information to Citi's Board, Selva fired Martin. *Id.* ¶ 74.

62. Additionally, Doe found several regulatory and compliance risks related to ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[10] Citi 2024 Form 10-K at 12.



63.     Also in April 2025, Doe was asked to review a confidential client case by a banker and account executive ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████ ███████

64.     Considering the issues Doe uncovered with ████████████████████████, Doe escalated her concerns to Sequeira. At Sequeira's request, Doe set up a call with CCO Cole, COO Valderrabano, General Counsel Yamahara, and AML Officer Vitola for April 8, 2025.

**Citi Unlawfully Terminates Doe's Employment**

65.     But Citi fired Doe before she was able to lead that meeting.

66.     On April 4, 2025, Sequeira lost his temper with Doe over her repeated escalations of serious issues and began speaking to Doe in an unprofessional manner. Doe urged Sequeira to maintain a professional tone.

67.     Shortly after Doe stood up for herself to Sequeira, Citi suddenly and arbitrarily sicced another "investigative" unit on Doe, this time calling on the Citi Security and Investigative Services ("CSIS") to inquire—far outside their ordinary remit—into Doe's "discrimination" against ███████████████████████████.

68.     The *Financial Times* recently revealed allegations that "CSIS operates as HR's internal hit squad" at Citi, and that several employees reported that "their statements to CSIS were later used against them, including two who said they were forced out after raising compliance concerns."[11]

69.     That is exactly what happened to Doe. Doe believed she had swiftly assuaged CSIS's concerns, demonstrating with documentation that, for example, ███████████████ ████████████████████████████████████. From the tenor of her conversations with CSIS, Doe left with the impression that CSIS understood that Doe's focus was on ██████████, not a biased distaste for disparate and seemingly random nationalities from across the globe like ███████████████████.

70.     Three days after Sequeira lost his temper with Doe, on April 7, 2025, Citi announced that CSIS "concluded" the "investigation" it had begun mere days beforehand and announced that Citi was terminating Doe's employment. Citi commanded Doe to vacate the premises immediately.

71.     At the time of Doe's firing, Sequeira advised her that she was being fired because of her "management style" and the "nature of engagement with her team and partners."

---

[11] A. Quinio, *Citi's Security Unit Was Meant to Probe Misconduct. Employees Say It Protected the Bank Instead*, FIN. TIMES (Mar. 4, 2026), *available at* https://www.ft.com/content/dddf2192-5550-4a22-976b-07d81021a5ea?syn-25a6b1a6=1

██ ████████████████████████████   ████████████████████████████

72.     No one, including Sequeira, had expressed either of those criticisms to Doe before her firing. Unlike other Citi employees, Doe did not receive an annual review in 2024 and had no notice that Sequeira considered her "management style" an issue.

73.     Sequeira's bogus "management style" explanation was also belied by the flood of support Doe received from her team when they found out she had been unceremoniously fired. One direct report—whom Doe had supervised for scarcely six months—asked Doe to "take me with you," or words to that effect.

74.     Citi further undercut its own claim of firing Doe for "management style" when Doe applied for unemployment benefits. To deny Doe unemployment benefits, Citi radically changed its story, telling the New York Department of Labor that Doe was fired for "fail[ing] to follow instructions/policy/contract." Doe ultimately was able to receive unemployment benefits.

75.     Additionally, Citi consistently gives enormous leeway to abusive managers who are not whistleblowers, often lauding their abuse as a positive form of "management style," demonstrating that the "management style" claim was pretextual.

76.     Indeed, Sequeira himself told Doe that HR investigations into Citi managers were so commonplace he described them as a "rite of passage," and heard the same from Valderrabano. Yet neither Sequeira nor Valderrabano's employment was terminated.

77.     A few publicly reported examples further bear out that Citi celebrates, rather than punishes, aggressive and even abusive management practices so long as they come from non-whistleblowers.

    a.  *Bloomberg* reported that Andy Sieg made a managing director cry after scolding him and slamming a table in front of colleagues.[13] Citi defended Sieg

---

[13] https://www.bloomberg.com/news/articles/2025-08-20/citi-investigates-hr-complaints-against-wealth-head-andy-sieg

and did not terminate his employment.

b.  Citi paid $52 million to hire Vis Raghavan even though he was forced out of JPMorgan Chase over his abusive behavior.[14]

c.  An anonymous entry on the website wallstreetdiscriminates.com asserts that a male managing director known for bullying called a woman an expletive in a team meeting, which Citi concluded was "misunderstood"

d.  An anonymous entry on the website wallstreetdiscriminates.com asserts that a male managing director would often call his female subordinates offensive and derogatory names in public meetings behind their backs, and when a woman lodged an ethics complaint, the woman was retaliatorily stripped of responsibilities, and the man was promoted

e.  An anonymous entry on the website wallstreetdiscriminates.com asserts that a male wealth executive berated subordinates mercilessly to the point where one of his female employees forced herself to vomit before meetings so she would be too physically depleted to cry.

f.  An anonymous entry on the website wallstreetdiscriminates.com asserts that a male managing director berated women to the point of tears on calls, and that HR's response was "that's just how he is."

78.  Moreover, at the time Citi unlawfully terminated Doe's employment, it also owed her substantial sums that had vested in late March under the terms of the Offer Letter. By the end of March 2025, substantial sums were scheduled to vest and were due and owing to Doe.

79.  Citi refused to pay Doe any of those sums and has persisted in its refusal after her

---

[14] https://www.ft.com/content/e45c2c21-babe-4fd9-85f1-2b2b3aa38872?syn-25a6b1a6=1

unlawful termination.

80.     Because of Defendants' unlawful conduct, Plaintiff has lost substantial income, suffered emotional distress, and her career and reputation have been irreparably harmed, among other losses.

81.     Defendants' unlawful conduct was intentional and in blatant disregard of Plaintiff's legal and civil rights and warrants imposition of punitive damages.

## COUNT I

### RETALIATION UNDER THE SARBANES-OXLEY ACT

82.     Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

83.     Section 806 of the Sarbanes-Oxley Act provides that an employer may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of" an employee's protected activity. 18 U.S.C. § 1514A(a).

84.     Plaintiff engaged in protected activity by reporting conduct that she reasonably believed to violate federal laws and regulations enumerated in 18 U.S.C. § 1514A(a).

85.     Plaintiff's protected activity was a contributing factor to the termination of Plaintiff's employment, the refusal to pay sums owed to her, and other adverse employment actions.

86.     Plaintiff suffered damages as a result of Defendants' violation of the Sarbanes-Oxley Act.

### PRAYER FOR RELIEF

20

**WHEREFORE**, Plaintiff requests the entry of judgment in her favor and against Defendants as follows:

    a.  Declare that the acts and conduct of Defendants are unlawful and violate the Sarbanes-Oxley Act;

    b.  Order Plaintiff reinstated to her appropriate position or award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

    c.  Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

    d.  Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

    e.  Award Plaintiff punitive damages due to Defendants' malicious conduct and/or their reckless or callous indifference to the statutorily protected rights of Plaintiff;

    f.  Award Plaintiff prejudgment interest;

    g.  Award Plaintiff attorneys fees, costs, and disbursements; and

    h.  Award Plaintiff such others make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiff,

By: */s/ Linda D. Friedman*

Linda D. Friedman (*pro hac vice forthcoming*)
Shona B. Glink (# 4051280)
Daniel B. Lewin (*pro hac vice forthcoming*)
STOWELL & FRIEDMAN LTD.
303 W. Madison, Suite 2600
Chicago, Illinois  60606
Phone: (312) 431-0888